**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

**Case Number: 23-cv-572**

LUIS PEREZ and JOSE MOLLA,
on behalf of themselves
and all others similarly situated,

       Plaintiffs,

v.                                                                              **CLASS ACTION**
                                                                                **JURY TRIAL DEMANDED**

REGAL REXNORD CORPORATION
and THOMSON TECHNOLOGY POWER
SYSTEMS ULC,

      Defendants.

_____ /

<u>**CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................... 1

II.     PARTIES, JURISDICTION, AND VENUE ........................................................ 3

      Plaintiff Luis Perez ........................................................................................... 3

      Plaintiff Jose Molla .......................................................................................... 6

      Defendant Thomson .......................................................................................... 7

      Defendant Regal ............................................................................................... 8

      Jurisdiction and Venue ..................................................................................... 9

III.    FACTUAL ALLEGATIONS .................................................................................11

      TSC900 Background .........................................................................................11

      The Defect ...................................................................................................... 15

      The Defendants' Knowledge of the Common, Uniform Defect .......................... 18

      The Defendants Market the TSC900 ................................................................ 19

      The Defendants Omit the Defect and Cease Distribution of the TSC900 ........... 20

      The Plaintiffs Have Been Injured .................................................................... 22

      The Defendants Breached Express Warranties ................................................. 23

      The Defendants Breached their Implied Warranty of Merchantability ................ 25

IV.     TOLLING OF THE STATUTE OF LIMITATIONS ......................................... 26

      Discovery Rule Tolling .................................................................................. 26

      Fraudulent Concealment Tolling ..................................................................... 26

      Estoppel ......................................................................................................... 27

V.      CLASS ALLEGATIONS ...................................................................................... 27

      Class Definitions ............................................................................................ 27

      Numerosity .................................................................................................... 29

      Commonality .................................................................................................. 29

      Typicality ...................................................................................................... 30

      Adequacy of Representation ........................................................................... 30

      Superiority/Predominance ............................................................................... 31

      Requirements of Federal Rule of Civil Procedure 23(b)(2).................................. 32

VI.     CLAIMS FOR RELIEF ....................................................................................... 32

      COUNT I VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE
      PRACTICES ACT ........................................................................................ 32

COUNT II BREACH OF EXPRESS WARRANTY ............................................. 36

COUNT III BREACH OF IMPLIED WARRANTY .......................................... 38

COUNT IV VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT .. 40

COUNT V UNJUST ENRICHMENT ................................................................ 45

**PRAYER FOR RELIEF** ........................................................................................ 46

**DEMAND FOR JURY TRIAL** ........................................................................... 47

Plaintiffs Luis Perez and Jose Molla file this class action complaint on behalf of themselves and all others similarly situated against Defendants Regal Rexnord Corporation and Thomson Technology Power Systems ULC.

## I.    INTRODUCTION

1.    Plaintiffs Perez and Molla bring their claims individually and on behalf of all persons or entities in the United States who purchased a Thomson Power Systems TSC900 Transfer Switch Controller.

2.    Defendants Regal and Thomson are leading producers of electrical products, including the TSC900. The TSC900 is an automatic transfer switch. Automatic transfer switches are designed to automatically control generators found in various locations, including homes, businesses, and hospitals.

3.    When a primary power source (like utility power) fails and a secondary power source (like a generator) is needed, the TSC900 is intended to automatically facilitate the transfer from utility power to the generator. The TSC900 is designed to do this by detecting the failure, transferring load to the generator, and connecting the generator power.

4.    When utility power is restored, the TSC900 is intended to transfer load back to the utility power source and stop running the generator. The TSC900 is designed to do this by detecting that utility power has been restored, transferring load back to the utility power source, and disconnecting the generator power.

5.    The TSC900, in other words, is intended to turn a generator on when utility power fails and turn a generator off when utility power is restored—all without the generator owner's assistance.

6.     But the TSC900 has a defect. Every TSC900 will eventually fail to perform its intended function. The TSC900 will fail to correctly detect when utility power has been restored, fail to stop the generator, and fail to transfer load back to the utility power source. So, while the TSC900 can turn a generator *on*, it fails to reliably turn the generator *off* when power is restored. The TSC900 does only half of what it was designed to do.

7.     Consumers across the country have notified the Defendants about the defect. But rather than fixing the defect, the Defendants continued to design, manufacture, and sell the defective TSC900; failed to inform consumers of the defect; and took no action to correct the problem. In doing so, the Defendants released various firmware updates and news bulletins addressing symptoms of the defect, spoke with customers who experienced TSC900 failures, and ultimately removed the TSC900 from circulation in 2023—without ever disclosing the defect.

8.     The Defendants also affirmatively misled customers. They told consumers, for example, that the TSC900 "automatically transfers to generator (source 2) during a utility (source 1) failure *and automatically returns power to utility once restored*" and that the TSC900 offers "fast, accurate[,] reliable operation." These representations were false.

9.     In the meantime, as the Defendants misrepresented the TSC900's capabilities and omitted any reference to the defect, consumers—including the Plaintiffs and the Class Members— continued to purchase TSC900s. These consumers were left paying to inspect, diagnose, and replace defective TSC900s when the product failed. Plaintiffs Perez and Molla collectively purchased six TSC900s because their TSC900s repeatedly failed—often in the matter of months.

10.     No reasonable consumer would expect their automatic transfer switch to fail to detect when utility power is stable and fail to transfer the power from the generator to the utility power source when utility power is restored. The Defendants capitalized on consumer expectations

and deceived their customers by omitting the defect from their marketing and misrepresenting that the TSC900 automatically returns to utility power once utility power is restored.

11.    The defect is material to the Plaintiffs and Class Members. Consumers paid a premium to purchase an automatic transfer switch that would automatically turn their generators on or off when utility power failed or was restored.

12.    Because of the defect and the Defendants' misrepresentations and omissions, the Plaintiffs and the Class Members overpaid for the TSC900 and were forced to incur additional expenses in ultimately replacing their TSC900s.

## II.    PARTIES, JURISDICTION, AND VENUE

13.    The following named plaintiffs are representatives of the members of the putative class.

**Plaintiff Luis Perez**

14.    Plaintiff Luis Perez is a citizen and resident of the State of Florida. Plaintiff Perez is over the age of twenty-one and is otherwise *sui juris*.

15.    Plaintiff Perez has purchased four TSC900s. Three of those devices have already failed. Within months, the devices failed to automatically transfer from generator power (the secondary source) to utility power (the primary source) once utility power was restored.

16.    Plaintiff Perez was unaware of the defect when he purchased his TSC900s. Plaintiff Perez had seen the Defendants' representations about the efficiency, dependability, and quality of the TSC900. He had also seen the Defendants' representations that the TSC900 automatically transfers from generator power to utility power when utility power is restored.

17.     Plaintiff Perez relied on those representations and believed that the Defendants would provide high-quality automatic transfer switches that could automatically transfer from generator power to utility power when utility power was restored.

18.     The Defendants never disclosed the defect to Plaintiff Perez—including when he purchased the TSC900, when he requested services from the Defendants, or when he notified the Defendants about the defect.

19.     Plaintiff Perez purchased his first TSC900 on November 11, 2021. Two months later, in January 2022, the TSC900 failed due to the defect. Specifically, the TSC900 failed to recognize the utility power source was operational and failed to switch the power from the generator (the secondary source) back to utility power (the primary source).

20.     On January 27, 2022, days after the TSC900 failed, Plaintiff Perez contacted his service provider—from whom he had purchased his TSC900. Plaintiff Perez's service provider attempted to troubleshoot the defective TSC900. The service provider reported the incident to the Defendants. But the Defendants never responded. Plaintiff Perez's service provider spent additional time trying to repair the TSC900, but nothing worked.

21.     On January 27, 2022, in reliance on the Defendants' representations, Plaintiff Perez purchased his second TSC900. Months later, on August 2, 2022, when the second device failed, Plaintiff Perez again contacted his service provider who attempted to troubleshoot the defective device. Plaintiff Perez's service provider again reported the incident to the Defendants. But the Defendants failed to respond. Plaintiff Perez's service provider spent additional time trying to repair the TSC900, but nothing worked.

22.     On August 2, 2022, in reliance on the Defendants' representations, Plaintiff Perez purchased his third TSC900. About two months later, on October 17, 2022, when the third device

4

failed, Plaintiff Perez contacted his service provider who attempted to troubleshoot what turned out to be a third defective device. Plaintiff Perez's service provider reported the incident to the Defendants, but the Defendants again failed to respond. Plaintiff Perez's service provider spent additional time attempting to repair the TSC900. But nothing worked.

23.    On October 17, 2022, in reliance on the Defendants' representations, Plaintiff Perez purchased his fourth (and final) TSC900. A few months passed before the Defendants, on February 15, 2023, informed Plaintiff Perez that they were going to stop selling the TSC900 going forward. Although they stopped selling the TSC900, the Defendants did not offer to repair or replace TSC900s that they had already sold and delivered to consumers (like Plaintiff Perez).

24.    In short, between November 2021 and February 2023—a little over a year— Plaintiff Perez purchased four TSC900s. Each time the TSC900 failed, Plaintiff Perez hired service providers in an attempt to troubleshoot the defective devices. He also installed the Defendants' firmware updates as they were released. Yet the TSC900s continued to malfunction.

25.    At no point during Plaintiff Perez's attempts to resolve his issues with the Defendants did the Defendants ever disclose the defect.

26.    Instead, the Defendants continued to state that there was no defect, represented that their product could automatically transfer from generator power to utility power, and failed to respond to consumer complaints—all while the Defendants knew (or should have known) that their product was defective.

27.    Had Plaintiff Perez known of the defect, he would not have purchased the TSC900 or would have paid significantly less.

**Plaintiff Jose Molla**

28.     Plaintiff Jose Molla is a citizen and resident of the State of Florida. Plaintiff Molla is over the age of twenty-one and is otherwise *sui juris*.

29.     Plaintiff Molla has purchased two TSC900s. His first TSC900 has failed. Because of the common defect found in all TSC900s, Plaintiff Molla's device failed to automatically transfer from generator power to utility power once utility power was restored.

30.     Plaintiff Molla was unaware of the defect when he purchased his TSC900s. Plaintiff Molla had seen the Defendants' representations about the efficiency, dependability, and quality of the TSC900. He had also seen the Defendants' representations that the TSC900 automatically transfers from generator power to utility power when utility power is restored.

31.     Plaintiff Molla relied on those representations and believed that the Defendants would provide high-quality automatic transfer switches that could automatically transfer from generator power to utility power.

32.     The Defendants never disclosed the defect to Plaintiff Molla—including when he purchased the TSC900, when he requested services from the Defendants, or when he notified the Defendants about the defect.

33.     Plaintiff Molla's first TSC900 failed due to the defect in November 2022. Specifically, the TSC900 failed to recognize that utility power was operational and therefore failed to switch the power from the generator back to utility power. Plaintiff Molla had installed the Defendants' firmware updates as they were released. But his TSC900 still malfunctioned.

34.     On November 18, 2022, shortly after his TSC900 failed, Plaintiff Molla contacted his service provider—from whom he had purchased his TSC900. Plaintiff Molla's service provider attempted to troubleshoot the defective TSC900. The service provider also reported the incident to

the Defendants. But the Defendants never responded. Plaintiff Molla's service provider spent additional time trying to diagnose, repair, and service the TSC900, but nothing worked.

35.    On November 18, 2022, the same day he spoke with his service provider, Plaintiff Molla, in reliance on the Defendants' representations, purchased his second TSC900.

36.    Months later, on February 15, 2023, the Defendants informed Plaintiff Molla that they were going to stop selling the TSC900 going forward. Although they stopped selling the TSC900, the Defendants did not offer to repair or replace the defective TSC900s that they had already sold and delivered to consumers (like Plaintiff Molla).

37.    At no point during Plaintiff Molla's attempts to resolve his issues with the Defendants did the Defendants ever disclose the defect.

38.    Instead, the Defendants continued to represent that there was no defect, represented that their product could automatically transfer from generator power to utility power, and failed to respond to consumer complaints—all while the Defendants knew (or should have known) that their product was defective.

39.    Had Plaintiff Molla known of the defect, Plaintiff Molla would not have purchased the TSC900s or would have paid significantly less.

**Defendant Thomson**

40.    Thomson is an Alberta, Canada corporation with its principal place of business at 4916 – 275th Street, Langley B.C., Canada, V4W 0A3. Thomson's registered office is 4300 Bankers Hall West, 888 – 3rd Street S.W. Calgary, Alberta, T2P5C5.

41.    Thomson is one of the leading manufacturers of electrical products and systems in the power generation industry. The company specializes in the design and manufacturing of power generation systems and automatic transfer switches for low and medium voltage applications.

42.     At all relevant times, Thomson, directly or through its agents, manufactured, distributed, warranted, sold, and serviced the TSC900 throughout the United States and in this District. Thomson also, directly or through its agents, marketed and promoted the sale of the TSC900 throughout the United States and in this District.

43.     Thomson approved the defective TSC900, and approved and publicized advertisements and marketing materials designed to sell the TSC900. Thomson sold TSC900s with the defect in all fifty states, including Wisconsin.

44.     Thomson has approximately fifteen locations in the United States and employs over seventy-five workers in the United States. Thomson maintains corporate offices throughout the United States.

45.     Salespeople, distributors, service providers, and others operate as Thomson's agents. Thomson provides training, instruction, and information about the TSC900 to these agents.

46.     This case arises out of or relates to Thomson's purposeful conduct availing itself of the market of the United States and this District. If not for Thomson's distribution and promotion of the TSC900 in the United States and this District, the Plaintiffs could not and would not have purchased the TSC900 or suffered the resulting damages.

**Defendant Regal**

47.     Regal is incorporated in Wisconsin. Regal's principal place of business and headquarters is located at 200 State Street, Beloit, Wisconsin 53511-6254. Regal's registered agent is Corporation Service Company, which is located at 33 E. Main Street Suite 610, Madison, Wisconsin 53703-4655. Regal is registered as a domestic business in Wisconsin.

48.     Regal is a global corporation that engineers and manufactures industrial solutions, power components, and electrical motors and controls. Regal holds itself out as a "leading

manufacturer of . . . power generation and power transmission products." Regal is divided into four operating segments. The "industrial systems" segment includes Thomson and the TSC900. Regal advertises that Thomson is in its "family of brands." Regal is Thomson's parent company.

49.     At all relevant times, Regal, directly or through its agents, manufactured, distributed, warranted, sold, and serviced the TSC900 throughout the United States and in this District. Regal also, directly or through its agents, marketed and promoted the sale of the TSC900 throughout the United States and in this District.

50.     Regal approved the defective TSC900. It also approved and publicized marketing materials designed to sell the TSC900. Regal sold defective TSC900s in all fifty states, including Wisconsin.

51.     Salespeople, distributors, service providers, and others operate as Regal's agents. Regal provides training, instruction, and information about the TSC900 to these agents.

**Jurisdiction and Venue**

52.     This Court has subject matter jurisdiction over this case under the Class Action Fairness Act of 2005. *See* 28 U.S.C. § 1332(d). Members of the proposed class are citizens of states other than Regal's home state of Wisconsin, the total amount in controversy exceeds $5,000,000 exclusive of interest and costs, and there are hundreds of putative class members. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 to the extent any of the Plaintiffs' claims fall outside this Court's original subject matter jurisdiction.

53.     This Court has personal jurisdiction over Regal under Wisconsin Statutes § 801.05(1)(d) because Regal is engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise. Regal is incorporated and

headquartered in Wisconsin. Regal's affiliations with this state are thus so continuous and systematic such that Regal is essentially at home in Wisconsin.

54.    This Court has personal jurisdiction over Thomson under Wisconsin Statutes § 801.05(3) because persons or property within or without this state suffered injuries arising out of Thomson's acts or omissions within this state. This Court also has personal jurisdiction over Thomson under Wisconsin Statutes § 801.05(5). In the alternative, this Court has personal jurisdiction over Thomson under Federal Rule of Civil Procedure 4(k).

55.    Thomson has significant contacts with Wisconsin. The Plaintiffs would not have purchased the TSC900 if not for both of the Defendants' intentional acts of manufacturing, selling, distributing, and servicing the TSC900 in this District.

56.    Thomson has received substantial benefits from knowingly manufacturing, selling, distributing, and servicing TSC900s in this District. Thomson has purposefully availed itself of the Wisconsin automatic transfer switch market by producing, advertising, and selling products intended for purchase, installation, and use in this District.

57.    The Defendants' extensive contacts with Wisconsin and purposeful availment of this state's market render the exercise of jurisdiction by this Court over them and their respective affiliated or related entities permissible under traditional notions of fair play and substantial justice.

58.    Venue is proper in this forum under 28 U.S.C. § 1391 because Regal resides in this District and because Thomson is a foreign entity that may be sued in any judicial district.

59.    All conditions precedent to this action have occurred, been performed, or have been waived.

### III.     FACTUAL ALLEGATIONS

**TSC900 Background**

60.     Consumers use automatic transfer switches like the TSC900 to automatically transfer power from the primary utility power source to their generators in the event that utility power fails. Consumers also use automatic transfer switches like the TSC900 to automatically re-transfer the load back to the utility power source once it is within normal operating limits.

61.     Automatic transfer switches—like the TSC900—are not only recommended but also essential to prolonging the life of a generator and reducing costs for the consumer. Generators have a limited lifespan and require fuel, oil, and maintenance to operate. Continuous operation of a generator is costly compared to utility power. And the life expectancy of generators is shortened when they run for an extended period of time. A generator is not designed to replace utility power but instead to act as a temporary power source until utility power is restored. A generator left on for a prolonged period of time can overheat or break down.

62.     Automatic transfer switches are also essential for operating a generator conveniently and safely. As to convenience, without an automatic transfer switch, consumers would have to turn their generators on or off any time utility power failed or was restored. They would also have to be available at their home to turn their generators on and off.

63.     As to safety, automatic transfer switches are designed to prevent consumers from having to navigate to their generators in dark conditions or hazardous weather. Automatic transfer switches are particularly important for the elderly and those with disabilities—who may have trouble reaching their generator and who may rely on it for food and light. They are also important for businesses and hospitals that depend on automatic transfer switches and generators to keep critical equipment running.

64.    Introduced in 2015, the TSC900 replaced the TSC800. The TSC800 automatic transfer switches functioned as advertised. Distributors and vendors continue to sell remanufactured TSC800s to this day due to their reliability.

65.    The TSC900 introduced a seven-inch LCD touchscreen to allow users to easily program the automatic transfer switch. The TSC900 was designed, manufactured, and sold to serve as an emergency standby automatic transfer switch.

66.    The TSC900 includes two components that together direct power between utility power and generator power. The first component is a graphical human machine interface controller—that is, the device's touchscreen. The touchscreen is located on the exterior of the stainless-steel enclosure that houses the rest of the TSC900. With the touchscreen, users can program the TSC900.

67.    The TSC900's second component is its switch control unit (sometimes referred to as the "SCU"), which is fixed to the panel inside the stainless-steel enclosure. The switch control unit is responsible for monitoring voltage from various power sources, determining when the generator runs, and transferring power from utility power to a generator. Consumers also use the switch control unit to program and test power systems.

68.    The TSC900 is pictured below:



69.     The TSC900's touchscreen is still in use as part of the Defendants' other products, including the TS880, TS870, and TS970.

70.     The Defendants assured consumers that the TSC900 could be programmed to monitor voltage, transfer power to and from the utility and generator sources, and run periodic tests to ensure the generator was functioning properly.

71.     Plaintiffs Perez and Molla have operated the TSC900 as intended and as directed by the TSC900 owner's manual.

72.     The Defendants manufactured, advertised, sold, delivered, and provided services for the TSC900 from 2015 to April 2023.

73.     None of the Defendants' advertisements, representations, or communications with the Plaintiffs and Class Members included any mention or disclosure of the defect or its associated safety hazards. Had the Defendants disclosed the defect, the Plaintiffs and the Class Members would not have purchased the defective TSC900 or would have paid significantly less.

13

74.    Neither the Defendants nor any of their agents, dealers, distributors, servicers, or other representatives informed the Plaintiffs or the Class Members of the TSC900's defect and its associated safety hazards prior to the Plaintiffs' and Class Members' purchase of the TSC900.

75.    When the Plaintiffs purchased the TSC900, they relied on the reasonable expectation—and the Defendants' representations—that the TSC900 would work as intended, be free from defects, and would not pose a threat to their safety or their property. In fact, the Defendants emphasize the quality and reliability of their products, including the TSC900, knowing that consumers, like the Plaintiffs and the Class Members, rely upon such representations.

76.    As a result of the Defendants' unfair and deceptive conduct, breach of common law and statutory duties, and omissions and misrepresentations relating to the defective TSC900, the Plaintiffs and the Class Members did not receive the benefit of their bargains and have suffered actual damages, including overpayment for the TSC900 and out-of-pocket losses from replacing their TSC900s.

77.    There are no material differences between the Plaintiffs' circumstances and those of the putative Class Members. Each Plaintiff and putative Class Member purchased a defective TSC900. Each Plaintiff and putative Class Member was similarly damaged by the Defendants because they (1) did not receive the benefit of their bargain; (2) purchased a TSC900 that is of a lesser standard, grade, or quality than represented; and (3) paid a price premium based on the Defendants' misrepresentations and omissions.

78.    The Defendants possessed superior and exclusive knowledge of the TSC900's defect and knew, should have known, or recklessly disregarded the fact that the TSC900 was defective, and instead marketed the TSC900 as reliable and defect-free.

79.     Each Plaintiff and putative Class Member was deprived of having a defect-free TSC900, and the Defendants have been unjustly enriched by their delay in repairing or replacing the TSC900 or issuing a recall (and thereby saving the cost of a recall) on the defective TSC900. The Defendants have also been unjustly enriched by profiting off of their misrepresentations.

**The Defect**

80.     The TSC900 is an automatic transfer switch that monitors the utility power source. If that source fails or falls below a specific voltage threshold, the TSC900 will activate the generator. The TSC900 is also intended to re-transfer the load back to the utility power source when utility power is restored. As more fully outlined below, as a result of the defect, the TSC900 (more specifically the TSC900's switch control unit) fails to transfer power from the generator to the utility power source when safe to do so.

81.     The TSC900's switch control unit is responsible for monitoring power levels. When operating normally, the switch control unit is powered by utility power. In the event that utility power fails, the switch control unit requires a backup power source in order to keep certain timing circuits running, including the time delay that is used to start the generator. The time delay is critical to avoid starting the generator during brief flickers or losses of power.

82.     To create a backup power source and accomplish this time delay, the Defendants equipped the TSC900 with supercapacitors. The switch control unit uses supercapacitors to temporarily power the TSC900 in the event of a utility power failure. Supercapacitors are high-capacity devices used to store electrical energy. But each supercapacitor has a limited power rating. The switch control unit uses four supercapacitors to store energy.

83.     In the event of a power failure, the switch control unit draws power from the supercapacitors in order to switch the power from the utility power source to the generator without

interruption. The supercapacitors are critical to the function of the TSC900. Without them, the TSC900 would not be able to transfer power from utility power to generator power when utility power fails.

84.     To meet the power requirements for the transfer, the supercapacitors were connected in series which allows an increase in total voltage output levels. Notwithstanding the increased total voltage levels, each individual supercapacitor retains its individual maximum power rating.

85.     By wiring the supercapacitors in a series to increase the total voltage level, the Defendants created greater exposure for failure. As stated above, while wiring the supercapacitors in a series increases total voltage, the maximum voltage rating for each individual supercapacitor does not increase. When wiring the supercapacitors in a series, it is imperative that the individual supercapacitors are not exposed to voltage beyond the maximum individual voltage level because over-voltage can cause damage to the integrity of the supercapacitors.

86.     There are several readily available—and cost-effective—products that would help ensure that capacitors are not exposed to over-voltage. These products include, for example, paralleled resistors, chips, and converters.

87.     When functioning properly, the internal solution that supercapacitors use to store and increase electrical capacity remains inside the supercapacitors and allows them to store additional power. In the event of a malfunction, the internal solution of the supercapacitors can escape and damage surrounding circuitry due to its acidic and corrosive makeup.

88.     The TSC900's supercapacitors are located near the circuitry used to measure voltage from the utility and generator power sources. When the acidic and corrosive solution leaks from the supercapacitors, it damages the switch control unit's ability to sense voltage from these

sources. Here is a picture showing the acidic and corrosive solution leaking from supercapacitors as a result of the defect:



89.    This is the precise fault that Plaintiffs Perez and Molla (and the Class Members) suffered: The supercapacitors are inevitably exposed to over-voltage because they are placed in a series to produce total voltage output levels that exceed each individual supercapacitor's individual maximum power rating. When the supercapacitors are exposed to over-voltage, an acidic and corrosive solution leaks from the supercapacitors, compromising the switch control unit's ability to sense voltage from the utility power source and the generator. The result of this damage is that the switch control unit cannot detect when utility power is restored and thus cannot initiate the transfer from the generator back to the utility power source.

90.    Due to the defect, the TSC900 is unable to recognize when utility power is restored and fails to transfer power from the generator back to the utility power source. As a result, the generator continues to operate as the main source of power until the generator fails or the power is transferred manually.

91.    The TSC900 and accompanying switch control unit were designed and marketed to consumers to automatically transfer power from the utility power source to a generator and then back to the utility power source. Because of the defect, the TSC900 does not operate as advertised.

92.    Every TSC900 shares this common, uniform defect.

93.    Although they knew or should have known of the defect, the Defendants have refused to warn customers, issue a recall, or take responsibility for the defect. Instead, the Defendants affirmatively misrepresented the reliability and capabilities of their product, and they omitted the defect's existence from their public statements.

**The Defendants' Knowledge of the Common, Uniform Defect**

94.    As early as 2018, the Defendants knew or should have known that TSC900s were failing to switch power from the generator to the utility supply.

95.    The Defendants received complaint after complaint from various suppliers, distributors, representatives, and consumers about issues with the TSC900—issues which are now known to be symptoms of the defect.

96.    In response, the Defendants spoke to various suppliers, distributors, representatives, and consumers about the TSC900. The Defendants never disclosed the defect.

97.    The Defendants had exclusive and superior knowledge that the TSC900 was defective. Consumers, relying on the Defendants' reputation and communications, paid inflated prices for the TSC900 and incurred out-of-pocket costs replacing the defective TSC900s.

18

**The Defendants Market the TSC900**

98.    In their advertising, brochures, and product manuals, the defendants represented that they produced reliable automatic transfer switches. They also represented that the TSC900 will turn generators on when utility power goes out and off when utility power is restored. Here are a few examples of those representations:

a.    The Defendants represented that the "Thomson brand stands as a name that can be trusted in the [p]ower [g]eneration [i]ndustry" and that "Thomson can be relied on to deliver 'Power on Demand.'"

b.    The Defendants represented that the TSC900 provides "the most advanced integrated technology in Thomson Power Systems Automatic Transfer Switches."

c.    The Defendants represented that the TSC900's advanced features included technology that provides "fast, accurate[,] reliable operation."

d.    The Defendants represented that the TSC900 "microcontroller design provides high accuracy for all voltage sensing and timing functions as well as providing many standard features."

e.    The Defendants represented that "[t]he [TSC900] controller utilizes multiple 32-bit microprocessor-based design technology, which provides high accuracy for all voltage sensing and timing functions."

f.    The Defendants represented that the TSC900 "automatically transfers to generator (source 2) during a utility (source 1) failure and automatically returns power to utility once restored."

g.    The Defendants represented that, "[u]nder normal operating conditions, the transfer switch operates automatically during a failure and restoration of utility power and does not require operator intervention."

h.    The Defendants represented that "[t]he generator will continue to supply the load until the utility supply has returned and the retransfer sequence is completed."

i.    The Defendants represented that, when utility power is restored, "[t]he load will then be transferred from the generator supply back to the utility supply."

j.    The Defendants represented that, "[w]hen the 'AUTO' re-transfer mode is selected, the load will be automatically re-transferred back to the original source and does not require operator intervention."

99.    All of these representations were false. The Defendants did *not* provide a reliable automatic transfer switch. The TSC900 *cannot* turn a generator off and transition back to the utility power source when utility power is restored.

100.    The Defendants failed to disclose that the TSC900 was defective. They did not alert consumers to the defect in their marketing, their manuals, or their direct communications with consumers.

**The Defendants Omit the Defect and Cease Distribution of the TSC900**

101.    The Defendants represented that updating the TSC900's software and firmware would resolve issues that the Plaintiffs and Class Members experienced due to the defect.

102.    For example, on March 22, 2018, the Defendants released a firmware update, version 1025, for the switch control unit that addressed "[p]ower [c]ontactor bug fixes." The power contactors, under the control of the microprocessor, switch the flow of power between the utility and generator supply. In their update, the Defendants did not disclose the defect.

103.    One year later, in June 2019, Regal issued a "Product Change Notification," addressing another firmware update for the TSC900. The document did not disclose the defect, described symptoms of the defect as a "random occurrence," and recommended that consumers update their firmware to fix the issue.

104.    Thomson continued to offer firmware updates through 2023 in an effort to avoid incurring the cost of replacing the units.

105.    The Defendants misrepresented, both affirmatively and by omission, that the TSC900 was free from defects and took no action to adequately warn consumers or remedy the defect. The Defendants failed to disclose the defect and the potential damage that the defective TSC900s could cause.

106.    In February 2023, the Defendants finally decided to remove the TSC900 from their product line. On February 15, 2023, the Defendants sent a letter to suppliers, distributors, representatives, and consumers, including the Plaintiffs. The February 2023 Letter was addressed to "Valued Customers" with a subject line of "TSC900 Controller End of Life Notice."

107.    In their February 2023 Letter, the Defendants informed customers (and others) that they would "no longer" be selling TSC900s. The Defendants told customers with pending orders that "[e]xisting open orders with the TSC900 controller [would] be transitioned to the TSC7320 controller." But rather than inform customers that the Defendants had sold a defective product, the Defendants blamed "global supply chain disruption causing extraordinary delays." And while the Defendants offered TSC7320s to those with pending orders, the Defendants did nothing to address customers who had already purchased and received defective TSC900s.

108.    The February 2023 Letter states:

Multiple electronic components used in the TSC900 controller board have been and continue to be impacted by the global supply chain disruption causing extraordinary delays with open orders. In order to resolve this situation we are replacing the TSC900 controller with the new TSC7320 controller.

Thomson Technology Power Systems (Thomson) strongly believes that the new TSC7320 controller will meet you and our customers' expectations. . . . This change will enable us to address the ongoing supply chain issues with the TSC900 controller and allow us to continue to supply a high-quality product to you and our customers.

While we will continue to provide service support on the TSC900 controllers, effective immediately we will no longer accept [automatic transfer switch] orders with the TSC900 controllers. Existing open orders with the TSC900 controller will be transitioned to the TSC7320 controller. This change applies to our TS880, TS870[,] [and] TS970 [automatic transfer switch] product offerings.

A Thomson team member will be reaching out to you about your affected orders.

109.    The February 2023 Letter omits the existence of the defect and misrepresents that the Defendants were removing the TSC900 from the market because of supply chain issues. The Defendants "replac[ed]" the TSC900 because of the defect, not "global supply chain disruption."

110.    The February 2023 Letter appears to have been drafted jointly by Regal and Thomson and contains both companies' names in the letter's header. The February 2023 Letter was signed by Rawaha Tariq, Regal's business unit leader. In this role, Tariq "[l]ead[s] the [a]utomatic [t]ransfer [s]witch (ATS) division of Regal Rexnord" by "[m]anaging and supporting cross-functional teams such as [e]ngineering, customer service, sales[,] [and] manufacturing, to achieve systematic profitable business growth."

111.    The Defendants still refuse to admit the existence of the defect; have failed to warn consumers and the public about the defect; have not issued a recall; have not offered all consumers suitable repairs, remedial measures, modifications, or replacements free of charge; and have not offered to reimburse customers who incurred costs and damages relating to the defect.

**The Plaintiffs Have Been Injured**

112.    The Defendants' conduct in manufacturing, installing, servicing, and selling the defective TSC900—and their misrepresentations and omissions about the TSC900s—harmed the Plaintiffs and proposed Class Members and caused actual damages.

113.    The Plaintiffs and the proposed Class Members were deprived of the benefit of their bargain. The defective TSC900s were of a lesser standard, grade, and quality than the Defendants represented. The Plaintiffs and the Class Members paid more for their TSC900s than they would have had the Defendants disclosed the defect.

114.    The Defendants unjustly benefitted from putting a defective product on the market and charging a price premium based on their misrepresentations and omissions. Both the Plaintiffs and the Class Members were deprived of safe, defect-free TSC900s.

115.    The Plaintiffs and the Class Members have also suffered out-of-pocket damages, including (but not limited to) damages from paying for additional automatic transfer switches.

116.    The Plaintiffs bring this action on behalf of themselves and putative Class Members to recover damages for their lost benefit of the bargain and out-of-pocket expenses, and to obtain an injunction requiring the Defendants to repair or replace the defective TSC900s, to prevent further misrepresentations about the TSC900 defect, and to prevent the risk of future harms.

117.    The Plaintiffs need functional and reliable automatic transfer switches. They plan to purchase functional and reliable automatic transfer switches. And they would like to purchase an automatic transfer switch from the Defendants. But they will not purchase an automatic transfer switch from the Defendants until they are assured that the Defendants are enjoined from misrepresenting the qualities of their products.

**The Defendants Breached Express Warranties**

118.    The Defendants sell, market, and service the TSC900 with express warranties that assure buyers that the product is free from defects. The TSC900 defect violates these warranties. Here are just a few examples of the Defendants' express warranties:

   a.    The Defendants warranted that the "Thomson brand stands as a name that can be trusted in the [p]ower [g]eneration [i]ndustry" and that "Thomson can be relied on to deliver 'Power on Demand.'"

   b.    The Defendants warranted that the TSC900 provides "the most advanced integrated technology in Thomson Power Systems Automatic Transfer Switches."

   c.    The Defendants warranted that the TSC900's advanced features included technology that provides "fast, accurate[,] reliable operation."

23

d.  The Defendants warranted that the TSC900 "microcontroller design provides high accuracy for all voltage sensing and timing functions as well as providing many standard features."

e.  The Defendants warranted that "[t]he [TSC900] controller utilizes multiple 32-bit microprocessor-based design technology, which provides high accuracy for all voltage sensing and timing functions."

f.  The Defendants warranted that the TSC900 "automatically transfers to generator (source 2) during a utility (source 1) failure and automatically returns power to utility once restored."

g.  The Defendants warranted that, "[u]nder normal operating conditions, the transfer switch operates automatically during a failure and restoration of utility power and does not require operator intervention."

h.  The Defendants warranted that "[t]he generator will continue to supply the load until the utility supply has returned and the retransfer sequence is completed."

i.  The Defendants warranted that, when utility power is restored, "[t]he load will then be transferred from the generator supply back to the utility supply."

j.  The Defendants warranted that, "[w]hen the 'AUTO' re-transfer mode is selected, the load will be automatically re-transferred back to the original source and does not require operator intervention."

119.    Plaintiffs Perez and Molla relied on these warranties. They would not have purchased an unreliable automatic transfer switch that's unable to reliably transfer from generator power to utility power when utility power is restored. The representations were thus a basis of their bargain.

120.    The Defendants have breached their express warranties. The TSC900 is not accurate or reliable. The TSC900 fails under normal conditions to turn generators off and transition back to utility power when utility power is restored.

121.    As set out above, Plaintiffs Perez and Molla suffered damages as a result of the Defendants' breach of warranty. They lost out on the benefit of their bargain and suffered out-of-pocket losses as a result of the breach.

24

**The Defendants Breached their Implied Warranty of Merchantability**

122.    The Defendants breached their implied warranty of merchantability.

123.    A warranty that goods are merchantable is implied in all contracts for sale, so long as the seller is a merchant with respect to goods of that kind. To be merchantable, goods must be fit for their ordinary purposes.

124.    A merchant is one who deals in goods of the kind sold or is otherwise one who holds itself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his or her employment of an agent or other intermediary who by occupation holds itself out as having such knowledge or skill.

125.    The Defendants are TSC900 merchants because they regularly design, manufacture, and sell TSC900s and because they hold themselves out as having knowledge or skill peculiar to TSC900s. Thomson holds itself out as a "leading brand in electrical products . . . for use in the power generation industry, specializing in the design, engineering, and assembly of . . . automatic transfer switches." Regal holds itself out as a "leading manufacturer of . . . power generation and power transmission products" and includes Thomson in its "family of brands."

126.    The TSC900s are not fit for their ordinary purpose. Consumers purchase TSC900s to automatically turn their generators on when utility power fails *and* to automatically turn their generators off when utility power is restored. The TSC900 can reliably perform only half of its ordinary purpose. Because the TSC900 is defective, the Defendants have breached their warranty of merchantability.

25

## IV.    TOLLING OF THE STATUTE OF LIMITATIONS

**Discovery Rule Tolling**

127.    Within the time period of any applicable statutes of limitations, the Plaintiffs and the Class Members could not have discovered, through the exercise of reasonable due diligence, that the Defendants were concealing the defect and misrepresenting the safety and reliability of the TSC900.

128.    The Defendants have refused to issue a recall and the Plaintiffs and Class Members have no way of knowing about the defect until the TSC900 is used. Even after the TSC900 is used, the Plaintiffs and the Class Members have no ability to discover the actual nature of the defect and have been misled to believe there is no defect due to the Defendants' active concealment of the defect.

129.    For these reasons, all applicable statutes of limitations have been tolled by operation of the delayed discovery rule.

**Fraudulent Concealment Tolling**

130.    All applicable statutes of limitations have also been tolled by the Defendants' knowing and active fraudulent concealment and denial of the defect throughout the time period relevant to this action.

131.    Upon information and belief, the Defendants knew of the defect through consumer complaints, repair personnel complaints, warranty returns, and pre- and post-production testing and investigations.

132.    Despite this knowledge, the Defendants refused to disclose the nature of the defect and/or misrepresented the cause of the failures to consumers, distributors, and other service providers.

133.    The Defendants are under a continuing duty to disclose the true nature of the character, quality, and nature of the defect to the Plaintiffs and the Class Members. The Defendants did not disclose information about the defect and instead knowingly, affirmatively, or actively concealed the defect.

134.    The Plaintiffs and the Class Members reasonably relied on the Defendants' knowing, affirmative, or active omissions and concealment when they purchased, continued to purchase, and serviced the TSC900.

135.    Due to their fraudulent concealment, the Defendants are estopped from relying on any defense based on statutes of limitations.

**Estoppel**

136.    The Defendants are under a continuous duty to disclose to the Plaintiffs and the Class Members the true character, quality, and nature of the TSC900 and the defect. Instead, they knowingly, affirmatively, or actively concealed the defect.

137.    The Plaintiffs and the Class Members reasonably relied upon the Defendants' knowing, affirmative, or active concealment when they purchased, continued to purchase, and serviced the TSC900. The Defendants are thus estopped from relying on any defense based on statutes of limitations.

## V.    CLASS ALLEGATIONS

**Class Definitions**

138.    The Plaintiffs bring this action on their own behalf, and on behalf of all persons similarly situated, under Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and

superiority requirements of those provisions. The Plaintiffs seek to certify the following proposed nationwide class and state subclass:

**The Nationwide Class:**

All persons in the United States and Puerto Rico who purchased one or more TSC900s manufactured by the Defendants or any of their subsidiaries or affiliates within the statute of limitations.

**The Florida Subclass:**

All persons in Florida who purchased one or more TSC900s manufactured by the Defendants or any of their subsidiaries or affiliates within the statute of limitations.

139.    Excluded from each class are (1) the Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; (2) Class Counsel and their employees; and (3) the judicial officers and their immediate family members and associated court staff assigned to this case. Claims for any personal physical injuries related to the defect are also excluded.

140.    The Plaintiffs reserve the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

141.    The Plaintiffs also reserve the right to seek the certification of classes with respect to particular issues under Federal Rule of Civil Procedure 23(c)(4), including nationwide issues relating to unjust enrichment and breach of warranty claims.

142.    Certification of the Plaintiffs' claims for class-wide treatment is appropriate because the Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove these elements in individual actions alleging the same claims.

**Numerosity**

143.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1). There are hundreds of consumers nationwide who purchased TSC900s.

144.    The identity of Class Members is ascertainable, and can be easily identified through the records of the Defendants, their sales representatives, and their distributors. The Plaintiffs anticipate providing appropriate notice to each certified class in compliance with Federal Rules of Civil Procedure 23(c)(2)(A) or (B), to be approved by the Court after class certification, or as ordered by the Court under Federal Rule of Civil Procedure 23(d).

**Commonality**

145.    This action satisfies the requirements of Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each of the classes. These common questions predominate over any questions affecting only individual Class Members. The predominating common questions include (among other things):

    a.    whether, due to the defect, the TSC900 fails to properly detect the power supply from the utility power source;

    b.    whether, due to the defect, the TSC900 microprocessor fails to signal the status of the primary power source to the TSC900, the touchscreen, and the consumer;

    c.    whether, due to the defect, after the generator is running and utility power returns to operational, the TSC900 fails to retransfer load to the utility power source;

    d.    whether (and when) the Defendants learned of the defect;

    e.    whether there were other commercially viable options to cure the defect;

    f.    whether the Defendants provided sufficient warnings of the risks and nature of the defect;

    g.    whether the Defendants engaged in unfair, deceptive, or unlawful acts or practices by failing to disclose the defect and misrepresenting the nature and quality of the TSC900;

h. whether the Defendants made misrepresentations and omissions in their advertisements, brochures, product manuals, February 2023 Letter, and other communications (including those about firmware and software updates);

i. whether a reasonable consumer likely would be misled by the Defendants' misrepresentations and omissions;

j. whether the Defendants created express warranties through their statements about the TSC900;

k. whether the Defendants breached those express warranties by designing, manufacturing, distributing, or selling TSC900s that are unreliable and defective;

l. whether the Defendants breached their implied warranty of merchantability by designing, manufacturing, distributing, or selling TSC900s that are unreliable and defective;

m. whether the Plaintiffs and the Class Members overpaid for their TSC900s because of the Defendants' misrepresentations and omissions;

n. whether the Plaintiffs and the Class Members suffered damages as a result of the Defendants' refusal to repair or replace the defective TSC900s; and

o. whether damages, restitution, equitable, injunctive, declaratory, or other forms of relief are warranted.

**Typicality**

146.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(3) because the Plaintiffs' claims are typical of the claims of each of the Class Members, as all Class Members were and are similarly affected and their claims arise from the Defendants' same wrongful conduct. Each Class Member purchased a defective TSC900 and (as a result) has sustained—and will continue to sustain—damages in the same manner as the Plaintiffs. The relief the Plaintiffs seek in this action is typical of the relief sought for the absent Class Members.

**Adequacy of Representation**

147.    The Plaintiffs are adequate representatives under Federal Rule of Civil Procedure 23(a)(4). The Plaintiffs will fairly and adequately protect the interests of the Class Members. The

Plaintiffs are committed to the vigorous prosecution of this action and there is no hostility or conflict between or among the Plaintiffs and the unnamed Class Members. The Plaintiffs anticipate no difficulty managing this case as a class action.

148.    To prosecute this case, the Plaintiffs have chosen the undersigned law firms, who have substantial experience in prosecuting large and complex class actions and have the financial resources to meet the costs associated with the vigorous prosecution of this type of case. The Plaintiffs and their counsel will fairly and adequately protect the interests of all Class Members.

**Superiority/Predominance**

149.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class Members. The joinder of individual Class Members is impracticable because of the vast number of Class Members who own defective TSC900s.

150.    Because the monetary damages suffered by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class Members to redress the wrongs done to each of them individually, such that most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation by even a small fraction of the Class Members would be enormous.

151.    In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class Member. The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of

individualized litigation. Class adjudication is simply superior to other alternatives under Federal Rule of Civil Procedure 23(b)(3)(D).

152.    The Plaintiffs are unaware of any obstacles likely to be encountered in managing this case that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on the Plaintiffs' motion or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Federal Rule of Civil Procedure 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and employ Federal Rule of Civil Procedure 23(c)(5) to divide any Class into Subclasses.

**Requirements of Federal Rule of Civil Procedure 23(b)(2)**

153.    The Defendants have acted or failed to act in a manner generally applicable to the Class Members in the Nationwide Class and the Florida Subclass, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to either or all of the classes.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), Fla. Stat. § 501.201, et seq.
### against all Defendants
### on behalf of the Plaintiffs and the Florida Subclass

154.    The Plaintiffs incorporate by reference paragraphs 1 through 153 as though set forth herein.

155.    The Plaintiffs and the members of the Florida Subclass are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(7), (8).

156.    The Defendants engage in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(8).

157.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

158.    The Defendants engaged in unfair and deceptive trade practices that violated FDUTPA, including (but not limited to) the following:

   a.  the Defendants represented that the TSC900s have characteristics that they do not have;

   b.  the Defendants represented that the TSC900s are of a particular standard, quality, or grade, when they are not;

   c.  the Defendants represented that the TSC900s can automatically transition from generator power to utility power when utility power is restored, when they cannot;

   d.  the Defendants misrepresented the existence and the true nature of the defect; and

   e.  the Defendants failed to disclose the existence of the defect, even though they knew that such information was material to consumers.

159.    The Defendants' unfair or deceptive acts or practices—including misrepresenting the TSC900's capabilities and omitting material facts about the defect—had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to deceive reasonable consumers, including the Plaintiffs and the Florida Subclass Members, about the characteristics and reliability of the TSC900, the quality of the Thomson brand, and the true value of the TSC900s.

160.    The Plaintiffs and the Florida Subclass Members had no reasonable way to know that the TSC900s were defective and posed a safety hazard. The Defendants possessed superior knowledge as to the quality and characteristics of the TSC900s. The Plaintiffs and the Florida

Subclass Members had no reason to believe that the TSC900s were defective. Any reasonable consumer would have relied on the Defendants' misrepresentations and omissions.

161.    The Defendants misrepresented or omitted material facts about the TSC900 and the defect, and the Defendants misled the Plaintiffs and the Florida Subclass Members.

162.    The Plaintiffs and Florida Subclass Members were injured as a result of the Defendants' conduct because the Plaintiffs and Florida Subclass Members paid to own a TSC900 without a defect and instead received and overpaid for a defective product. The Plaintiffs and Florida Subclass Members paid a premium for their TSC900s. The Plaintiffs and Florida Subclass Members also suffered out-of-pocket losses in paying to replace their defective TSC900s.

163.    The Defendants' misrepresentations and omissions were material to the Plaintiffs and the Florida Subclass Members. An automatic transfer switch made by a reputable manufacturer of safe and functional automatic transfer switches is worth more than an otherwise comparable automatic transfer switch made by a disreputable manufacturer of dysfunctional automatic transfer switches.

164.    The Plaintiffs and the Florida Subclass Members have suffered ascertainable losses as a result of the Defendants' misrepresentations and failure to disclose information about the defect. Had they been aware of the defect, the Plaintiffs and Florida Subclass Members either would have paid less for their TSC900s or would not have purchased the TSC900s at all. The Plaintiffs and the Florida Subclass Members did not receive the benefit of their bargain due to the Defendants' misconduct.

165.    As a direct and proximate result of the Defendants' violations of FDUTPA, the Plaintiffs and the Florida Subclass Members have suffered an injury-in-fact and actual damages.

166.    The Plaintiffs and the Florida Subclass Members are entitled to recover their actual damages, including out-of-pocket losses from replacing their TSC900s and economic damages at the point of sale equal to the difference between the value of the TSC900 as promised and the value of the TSC900 as delivered. *See* Fla. Stat. § 501.211(2). The Plaintiffs and the Florida Subclass Members are also entitled to recover their attorneys' fees. *See* Fla. Stat. § 501.2105(1).

167.    The Plaintiffs are also entitled to declaratory and injunction relief. Florida Statutes § 501.211(1) states:

> Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

168.    The Plaintiffs were aggrieved by the Defendants' misrepresentations and omissions because they paid a price premium for the TSC900. A functional automatic transfer switch that can automatically turn a generator off is worth more than a defective automatic transfer switch that cannot automatically turn a generator off.

169.    The Plaintiffs and the Florida Subclass Members have also suffered and will continue to suffer irreparable harm if the Defendants continue to engage in deceptive, unfair, and unreasonable practices.

170.    The Plaintiffs are thus entitled to declaratory and injunctive relief under § 501.211(1) declaring that the Defendants' deceptive and unfair conduct violates FDUTPA and harms the consuming public, and enjoining the Defendants from further such violations.

171.    The Plaintiffs, on behalf of the Florida Subclass Members, request that the Court award them actual damages, declare that the Defendants' conduct violates FDUTPA, issue an order requiring the Defendants to notify the Florida Subclass Members of the defect and repair or replace

the defective TSC900, and award the Plaintiffs' and Florida Subclass Members' attorneys' fees. The Plaintiffs also request any other just and proper relief available under FDUTPA.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**against all Defendants**
**on behalf of the Plaintiffs and all Class Members**

172.    The Plaintiffs incorporate by reference paragraphs 1 through 153 as though set forth herein.

173.    The Plaintiffs bring this breach of express warranty claim on behalf of all Class Members, as there are no case-dispositive differences and therefore no true conflicts among the laws of the various states. In the alternative, the Plaintiffs bring this claim against the Defendants under the laws of the states where the Plaintiffs and the Class Members purchased their TSC900s.

174.    The Plaintiffs and each Class Member purchased a TSC900.

175.    The Defendants made affirmations of facts and promises to the Plaintiffs and the Class Members that related to the goods. For example, as set out above, the Defendants repeatedly represented that the TSC900 offers "fast, accurate[,] reliable operation" and that the TSC900 "automatically transfers to generator (source 2) during a utility (source 1) failure and automatically returns power to utility once restored."

176.    The Defendants made these representations directly to consumers through their advertising, brochures, manuals, communications, and other public materials. The Defendants' representations were directed to end-purchasers. The Defendants were thus in privity with the Plaintiffs and the Class Members.

177.    Nonetheless, privity is not required here because the Plaintiffs and Class Members are intended third-party beneficiaries of the contracts between the Defendants and their agents. The express warranties contained in those contracts are directly and primarily intended to protect

end-consumers, not distributors. When a product fails, it is the end-consumer that needs the Defendants to repair, replace, or pay for the defective TSC900. Distributors would have no need for such warranties because they do not install or use the TSC900s for themselves. The distributors have no rights under the warranty provisions that the Defendants provided with the TSC900s.

178.    The Plaintiffs and the Class Members trusted these representations and relied on them. The representations became part of the basis of their bargain. The Plaintiffs and the Class Members would not have purchased the TSC900s—or would have paid significantly less for their TSC900s—had they known that the TSC900s were unreliable and defective.

179.    The Defendants breached their warranties. The Defendants' representations about the TSC900s were false. For example, the TSC900 is not accurate, is not reliable, and is not able to properly serve as an emergency standby automatic transfer switch. The TSC900 fails to transition from generator power to utility power when utility power is restored.

180.    The Defendants, as well as all other businesses in the TSC900 supply chain, are on notice of the defect. Plaintiffs Perez and Molla notified the Defendants through the Plaintiffs' service providers from whom they directly purchased the TSC900s. The Defendants knew or should have known about the defect before they sold the TSC900s. The Defendants thus had a reasonable opportunity to cure the defect.

181.    The Plaintiffs and the Class Members were injured because of the Defendants' breaches. Had they been aware of the defect, the Plaintiffs and the Class Members either would have paid less for their TSC900s or would not have purchased the TSC900s at all. The Plaintiffs and the Class Members did not receive the benefit of their bargain due to the Defendants' breaches.

182.    To the extent the Defendants have tried to limit their warranties, any such attempt would be unenforceable. The Plaintiffs and the Class Members did not agree to (or bargain for)

any limitation on the Defendants' express warranties. Any limitation on those express warranties would be unconscionable. And any limited warranty would fail of its essential purpose because the defect was latent in that consumers could not detect the defect until the TSC900 failed.

183.    As a direct and proximate result of the Defendants' breaches of their express warranties, the Plaintiffs and the Class Members were injured and are therefore entitled to actual damages, including out-of-pocket losses from replacing their TSC900s and economic damages at the point of sale equal to the difference between the value of the TSC900 as promised and the value of the TSC900 as delivered.

**COUNT III**
**BREACH OF IMPLIED WARRANTY**
**against all Defendants**
**on behalf of the Plaintiffs and all Class Members**

184.    The Plaintiffs incorporate by reference paragraphs 1 through 153 as though set forth herein.

185.    The Plaintiffs bring this breach of implied warranty claim on behalf of all Class Members, as there are no case-dispositive differences and therefore no true conflicts among the laws of the various states. In the alternative, the Plaintiffs bring this claim against the Defendants under the laws of the states where the Plaintiffs and the Class Members purchased their TSC900s.

186.    An implied warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. For goods to be merchantable, they must at least be fit for the ordinary purposes for which such goods are used.

187.    A merchant is one who deals in goods of the kind sold or is otherwise one who holds itself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his or her employment of an agent or other intermediary who by occupation holds itself out as having such knowledge or skill.

188.    The Defendants are TSC900 merchants because they regularly design, manufacture, and sell TSC900s and because they hold themselves out as having knowledge or skill peculiar to TSC900s. Thomson holds itself out as a "leading brand in electrical products . . . for use in the power generation industry, specializing in the design, engineering, and assembly of . . . automatic transfer switches." Regal holds itself out as a "leading manufacturer of . . . power generation and power transmission products" and includes Thomson in its "family of brands."

189.    The TSC900s are not fit for their ordinary purpose. Consumers purchase TSC900s to automatically turn their secondary power source on when the primary power source fails *and* to automatically turn their secondary power source off when the primary power source is restored. The TSC900 can reliably perform only half of its ordinary purpose. The Defendants have thus breached their implied warranty of merchantability.

190.    The Defendants, as well as all other businesses in the TSC900 supply chain, are on notice of the defect. Plaintiffs Perez and Molla notified the Defendants through the Plaintiffs' service providers from whom they directly purchased the TSC900s. The Defendants knew or should have known about the defect before they sold the TSC900s. The Defendants thus had a reasonable opportunity to cure the defect.

191.    To the extent the Defendants have tried to exclude or modify their implied warranty of merchantability, that exclusion or modification is unenforceable. The Plaintiffs and the Class Members did not agree to (or bargain for) any limitation on the Defendants' implied warranties. In any event, the Defendants never mentioned the implied warranty of merchantability, provided no conspicuous writing disclaiming the implied warranty of merchantability, and have otherwise failed to exclude or modify the implied warranty of merchantability.

192.    The Plaintiffs and the Class members were the intended consumers of the TSC900 and the Defendants' warranties were intended to benefit the consumers and not the distributors, thereby establishing privity of contract.

193.    Nonetheless, privity is not required here because the Plaintiffs and Class Members are intended third-party beneficiaries of the contracts—and, specifically, the warranties—between the Defendants and their agents. The warranties are directly and primarily intended to protect end-consumers, not distributors. When a product fails, it is the end-consumer that needs the Defendants to repair, replace, or pay for the defective TSC900. Distributors would have no need for such warranties because they do not install or use the TSC900s for themselves. The distributors have no rights under the warranty provisions that the Defendants provided with the TSC900s.

194.    As a direct and proximate result of the Defendants' breaches of the implied warranty of merchantability, the Plaintiffs and the Class Members were injured and are therefore entitled to actual damages, including out-of-pocket losses from replacing their TSC900s and economic damages at the point of sale equal to the difference between the value of the TSC900 as promised and the value of the TSC900 as delivered.

### COUNT IV
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### ("Magnuson-Moss"), 15 U.S.C. § 2301, et seq.
### against all Defendants
### on behalf of the Plaintiffs and all Class Members

195.    The Plaintiffs incorporate by reference paragraphs 1 through 153 as though set forth herein.

196.    Magnuson-Moss provides a private right of action by purchasers of consumer products against manufacturers or retailers who, among other things, fail to comply with the terms

of written, express, or implied warranties. *See* 15 U.S.C. § 2310(d)(1). As alleged above, the Defendants failed to comply with the terms of their written, express, or implied warranties.

197.    The TSC900s are "consumer products" as defined by Magnuson-Moss because the TSC900s are tangible personal property distributed in commerce for personal, family, or household purposes. *See* 15 U.S.C. § 2301(1).

198.    The Plaintiffs and the Class Members are "consumers" as defined by Magnuson-Moss because they are buyers of the TSC900, transferees of the product during the duration of the warranties, or entitled by the terms of the warranty or state law to enforce the warranties. *See* 15 U.S.C. § 2301(3).

199.    Thomson is a "supplier" and "warrantor" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(4)–(5). Thomson is a supplier because it is engaged in making the TSC900s directly or indirectly available to consumers. Thomson is a warrantor because it has given a written warranty or may be obligated under an implied warranty.

200.    Regal is a "supplier" and "warrantor" as defined by Magnuson-Moss. *See* 15 U.S.C. § 2301(4)–(5). Regal is a supplier because it is engaged in making the TSC900s directly or indirectly available to consumers. Regal is a warrantor because it has given a written warranty or may be obligated under an implied warranty.

201.    The Defendants breached their express warranties. The Defendants made affirmations of facts and promises to the Plaintiffs and the Class Members that related to the goods. For example, as set out above, the Defendants repeatedly represented that the TSC900 offers "fast, accurate[,] reliable operation" and that the TSC900 "automatically transfers to generator (source 2) during a utility (source 1) failure and automatically returns power to utility once restored."

41

202.    The Defendants made these representations directly to consumers through their advertising, brochures, manuals, and other public materials. The Defendants' representations were directed to end-purchasers.

203.    The Plaintiffs and the Class Members trusted these representations and relied on them. The representations became part of the basis of their bargain. The Plaintiffs and the Class Members would not have purchased the TSC900—or would have paid significantly less for their TSC900s—had they known that the TSC900 was unreliable and defective.

204.    The Defendants breached their express warranties. Their representations about the TSC900s were false. For example, the TSC900 is not accurate, is not reliable, and is not able to properly serve as an emergency standby automatic transfer switch. The TSC900 fails to transition from generator power to utility power when utility power is restored.

205.    The Defendants also breached their implied warranty of merchantability. As set out above, the Defendants are TSC900 merchants because they regularly design, manufacture, and sell TSC900s and because they hold themselves out as having knowledge or skill peculiar to TSC900s. Because the Defendants are TSC900 merchants, they have impliedly warranted that their TSC900s are fit for their ordinary purpose.

206.    But the TSC900s are not fit for their ordinary purpose. Consumers purchase TSC900s to automatically turn their secondary power source on when the primary power source fails *and* to automatically turn their secondary power source off when the primary power source is restored. The TSC900 can reliably perform only half of its ordinary purpose. The Defendants have thus breached their implied warranty of merchantability.

207.    The Defendants, as well as all other businesses in the TSC900 supply chain, are on notice of the defect. Plaintiffs Perez and Molla notified the Defendants through the Plaintiffs'

service providers from whom they directly purchased the TSC900s. The Defendants knew or should have known about the defect before they sold the TSC900s. The Defendants thus had a reasonable opportunity to cure the defect.

208.    The Plaintiffs and the Class Members were injured because of the Defendants' breaches. Had they been aware of the defect, the Plaintiffs and the Class Members either would have paid less for their TSC900s or would not have purchased the TSC900s at all. The Plaintiffs and the Class Members did not receive the benefit of their bargain due to the Defendants' breaches.

209.    To the extent the Defendants have tried to limit their express warranties, any such attempt would be unenforceable. The Plaintiffs and the Class Members did not agree to (or bargain for) any limit to the Defendants' express warranties. Any limitation on those express warranties would be unconscionable. And any limited warranty would fail of its essential purpose because the defect was latent in that consumers could not detect the defect until the TSC900 failed.

210.    The Defendants knew that the TSC900s were defective and posed safety risks, and that the TSC900s would continue to pose safety risks after the warranties purportedly expired. The Defendants failed to disclose the defect to the Plaintiffs and other Class Members. And so the Defendants' enforcement of any durational limitations on warranties is unlawful.

211.    The Plaintiffs and the Class Members were the intended consumers of the TSC900 and the Defendants' warranties were intended to benefit the consumers and not the distributors, thereby establishing privity of contract.

212.    Nonetheless, privity is not required here because the Plaintiffs and Class Members are intended third-party beneficiaries of the contracts—and, specifically, the warranties—between the Defendants and their agents. The warranties are directly and primarily intended to protect end-consumers, not distributors. When a product fails, it is the end-consumer that needs the Defendants

to repair, replace, or pay for the defective TSC900. Distributors would have no need for such warranties because they do not install or use the TSC900s for themselves. The distributors have no rights under the warranty provisions that the Defendants provided with the TSC900s.

213.    The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25. The amount in controversy also meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

214.    The Plaintiffs and the Class Members have suffered, and are entitled to recover, damages as a result of the Defendants' breaches of warranty and violations of Magnuson-Moss.

215.    The Defendants had an opportunity to disclose information concerning the TSC900s' inability to perform as warranted, and to cure their breach of warranty. But the Defendants have failed to do so.

216.    As a direct and proximate result of the Defendants' conduct, the Plaintiffs and other Class Members have suffered damages and continue to suffer damages, including out-of-pocket losses from replacing their TSC900s and economic damages at the point of sale equal to the difference between the value of the TSC900 as promised and the value of the TSC900 as delivered.

217.    Additionally, or in the alternative, Magnuson-Moss provides for "other legal and equitable" relief where there has been a breach of warranty or failure to abide by other obligations imposed by Magnuson-Moss. *See* 15 U.S.C. § 2310(d)(1). Rescission and revocation of acceptance are equitable remedies available to the Plaintiffs and the Class Members under Magnuson-Moss.

218.    The Plaintiffs also seek, under Magnuson-Moss, an award of costs and expenses (including attorneys' fees) to prevailing consumers in connection with the commencement and prosecution of this action. *See* 15 U.S.C. § 2310(d)(2). The Plaintiffs and the Class Members intend

to seek such an award, including expert witness costs and other recoverable costs, as prevailing consumers at the conclusion of this lawsuit.

**COUNT V**
**UNJUST ENRICHMENT**
**against all Defendants**
**on behalf of the Plaintiffs and all Class Members**

219.    The Plaintiffs incorporate by reference paragraphs 1 through 117 and 127 through 153 as though set forth herein.

220.    The Plaintiffs bring this unjust enrichment claim in the alternative to any contractual claims.

221.    The Plaintiffs bring this claim on behalf of all Class Members under the common law of unjust enrichment, as there are no case-dispositive differences and therefore no true conflicts among the laws of the various states. In the alternative, the Plaintiffs bring this claim against the Defendants under Wisconsin law or the laws of the states where the Plaintiffs and the Class Members purchased their TSC900s.

222.    The Defendants have received and retained a benefit from the Plaintiffs and Class Members and inequity has resulted.

223.    The Plaintiffs and the Class Members directly conferred benefits on the Defendants: the difference between the price paid for a non-defective TSC900 (as advertised) and the value of a defective TSC900 that did not work safely or effectively (as received).

224.    The Plaintiffs and the Class Members paid a price premium for the TSC900 because of the Defendants' representations that the TSC900 was safe and fit for ordinary use. The Plaintiffs and the Class Members would not have purchased the TSC900, or would have paid significantly less, if not for these representations.

225.    The Defendants benefitted through their unjust conduct by selling TSC900s at a profit and for more than the TSC900s were worth. The Defendants also benefitted from their unjust conduct in refusing to recall and repair the TSC900s and thus saving that cost.

226.    The Defendants were aware that they were charging a premium for their product. The Defendants were aware that they were receiving a benefit they were not entitled to.

227.    It would be inequitable for the Defendants to retain these benefits. The Defendants will be unjustly enriched if they are allowed to retain the benefits.

228.    The Plaintiffs do not have an adequate remedy at law.

229.    Each Class Member is entitled to recover the amount by which the Defendants were unjustly enriched at his or her expense.

230.    Alternatively, the amount of the Defendants' unjust enrichment should be disgorged, in an amount to be proven at trial.

231.    The Plaintiffs, on behalf of themselves and all similarly situated Class Members, seek an award against the Defendants in the amount by which they have been unjustly enriched at the Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

The Plaintiffs, on behalf of themselves and all other similarly situated Class Members, request that the Court enter judgment against the Defendants as follows:

(1)    Declare this action to be a proper class action maintainable under Rules 23(b)(2) 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint the Plaintiffs as Class and Subclass representatives and the Plaintiffs' chosen counsel as Class Counsel;

(2)    Declare that the TSC900s are defective;

(3)    Declare that the Defendants are financially responsible for notifying all Class Members about the defect, issuing a recall for the TSC900s, and replacing (at their cost) each TSC900 in the market;

(4)    Declare that the Defendants' conduct is unlawful, unfair, or deceptive and issue an order permanently enjoining the Defendants from continuing the unlawful, deceptive, and unfair business practices alleged in this action;

(5)    Declare that the Defendants must disgorge, for the benefit of the Plaintiffs and the Class Members, all or part of the ill-gotten gains they received from the sale of TSC900s, or make full restitution to the Plaintiffs and the Class Members;

(6)    Award the Plaintiffs and the Class Members actual, compensatory, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial under the applicable claims;

(7)    Award the Plaintiffs and the Class Members their reasonable attorneys' fees and costs, as allowed by law;

(8)    Award the Plaintiffs and the Class Members pre-judgment and post-judgment interest as provided by law; and

(9)    Award the Plaintiffs and the Class Members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiffs demand a jury trial for any and all issues triable by a jury.

Respectfully submitted: August 22, 2023.

/s/ *Tal J. Lifshitz*
Tal. J. Lifshitz, Esq.
(*pending pro hac vice*)
Florida Bar No. 99519
tjl@kttlaw.com
Benjamin Widlanski, Esq.
(*pending pro hac vice*)
Florida Bar No. 1010644
bwidlanski@kttlaw.com
Robert J. Neary, Esq.
(*pending pro hac vice*)
Florida Bar No. 81712
rn@kttlaw.com
Brandon M. Sadowsky, Esq.
(*pending pro hac vice*)
New York Bar No. 5732847
bsadowsky@kttlaw.com

**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

Counsel for Plaintiffs

/s/ *Carlos Silva*
CARLOS E. SILVA, ESQ.
(*pending pro hac vice*)
Florida Bar No.: 999032
csilva@silvasilva.com
BENJAMIN FERNANDEZ IV, ESQ.
(*pending pro hac vice*)
Florida Bar No.: 63881
bfernandez@silvasilva.com
OLIVER SILVA, ESQ.
(*pending pro hac vice*)
Florida Bar No.: 1024669
osilva@silvasilva.com

**SILVA & SILVA, P.A.**
236 Valencia Avenue
Coral Gables, Florida 33134
Tel: 305.445.0011
Fax: 305.445.1181

Counsel for Plaintiffs